RICHARD W. BASTIAN, Plaintiff-Appellee, *v.* THE PERSONNEL BOARD OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.—NORMAN C. BYTTOW, Plaintiff-Appellee. *v.* THE PERSONNEL BOARD OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.—JOHN GREEN, Plaintiff-Appellee, *v.* THE PERSONNEL BOARD OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 81—0569, 81—0863, 81—1060 cons.

Opinion filed August 13, 1982.

Stanley Garber, of Chicago (Robert R. Retke and Mary K. Rochford, of counsel), for appellants.

Ditowsky & Contorer, of Chicago (Kenneth K. Kitkowsky, of counsel), for appellee Richard W. Bastian.

Epton, Mullin, Segal & Druth, Ltd., of Chicago (Saul A. Epton and Gerald B. Mullin, of counsel), for appellee Norman C. Byttow.

Rick Allan White, of Chicago, for appellee John Green.

JUSTICE WILSON delivered the opinion of the court:

This is a consolidated appeal involving three city employees who were discharged for violating the city residence requirement. The circuit court reversed the Personnel Board's decisions in the three cases, holding the ordinance to be unconstitutionally vague.[1] Defendant Personnel Board appeals from that ruling.

The ordinance in issue is chapter 25, section 30 of the Chicago Municipal Code, which provides:

---

[1] The trial court alternatively found that the Board decisions were not against the manifest weight of the evidence.

"All officers and employees in the classified civil service of the City shall be *actual residents* of the City. Any officer or employee in the classified civil service of the City who shall fail to comply with the provisions of this section shall be discharged from the service of the City in the manner provided by law." (Emphasis added.)

The factual situation in each case varies, but we need not discuss the evidence at length because the sufficiency of evidence is not material to the constitutional issue raised. The three plaintiffs, Richard W. Bastian, Norman C. Byttow, and John Green, are similarly situated with respect to the administration of the ordinance and we will describe a composite of their circumstances to provide a backdrop for our legal analysis.

All three plaintiffs were long-term city employees at the time they were discharged for violating the ordinance. Bastian and Byttow had been firemen for over 20 years and Green had worked for the water department for over 25 years. All are legally separated from their wives. Plaintiffs own, in joint tenancy with their estranged wives, homes outside of Chicago where the wives and children live. Plaintiffs spend some time at the suburban homes, to visit their children or to make repairs, and they also pay some or all of the household expenses and child support or maintenance.

Plaintiffs also rent apartments in Chicago and are registered to vote there. During their hearings before the Board, Bastian and Byttow offered evidence of other substantial connections to Chicago and had numerous witnesses testify in corroboration. Green's connection in Chicago appear weaker than those of the other two plaintiffs.[2]

Defendants' evidence on the charges against plaintiffs consisted of investigators' reports involving surveillances of their homes and canvasses of their neighbors. In each case, the suburban homes and the Chicago apartments were watched on several different dates in the early mornings. Evidence indicated that on more than one occasion, each plaintiff was observed leaving the suburban home in a car at approximately 6 or 7 a.m., on days that he reported for work. Investigators also testified that they did not observe plaintiffs enter or leave their Chicago apartments on the occasions that the surveillance was conducted there. The investigators further testified as to the results

---

[2]For example, Green was the only one who had checking and joint savings accounts in the suburb where his wife lived, and he also had two automobiles registered to that address. His Chicago apartment, unlike the ones rented by Bastian and Byttow, was a $60-a-month furnished room without a telephone, refrigerator or oven.

of canvasses they conducted of the plaintiffs' neighbors. Typically, the investigators would testify that one or more of the suburban neighbors recognized a photograph of the plaintiff but few if any persons from the Chicago apartment building could identify the photographs.

The Personnel Board in each case ruled, without specific findings, that the evidence supported the charges. After reviewing the proceedings the trial court reversed, holding that the ordinance was unconstitutionally vague. The court further held that if the reviewing court disagreed as to the constitutionality of the ordinance, the decisions were not against the manifest weight of the evidence.

OPINION

This case illustrates how the "plain meaning" of words can be the subject of extended and exhaustive debate. Defendants argue that the term "actual resident" has a common meaning, generally understood by the public (but apparently not so clear to lawyers). Additionally, they contend that the term "residence" has acquired a definite legal meaning through the case law, and therefore puts persons on notice of what is required. To support their position that the ordinance is not constitutionally vague they cite several cases which have construed "residence" as requiring that a person have a physical presence in a particular locale plus the intent to make that place his permanent abode. (*Hughes v. Illinois Public Aid Com.* (1954), 2 Ill. 2d 374, 380, 118 N.E.2d 14; *Miller v. Police Board* (1976), 38 Ill. App. 3d 894, 349 N.E.2d 544.) They further contend that the modifier "actual" strengthens the definition by eliminating the possibility of a constructive or sham residence.

Plaintiffs recognize that the above definition of residence, which equates with "domicile," has been employed by the courts; however, they point out that the legal definition of residence varies according to its context. A person can only have one domicile, or permanent abode, at a time; however, he may have several residences. See *United States v. Stabler* (3d Cir. 1948), 169 F.2d 995, 998; Reese & Green, *That Elusive Word, "Residence,"* 6 Van. L. Rev. 561 (1953); see also *Lister v. Hoover* (7th Cir. 1981), 655 F.2d 123, 128 ("With apologies to Gertrude Stein, a resident is not a resident is not a resident. Resident status necessarily varies with the state program at issue.").

The trial court, quoting from Black's Law Dictionary, agreed with plaintiffs that residence and domicile, though closely related, have different legal meanings and that residence is susceptible to more than one meaning. Accordingly, the court struck down the ordinance for

vagueness.

■■■ We are aware of no Illinois cases to date that have squarely considered this constitutional challenge to the ordinance. The constitutional permissibility of requiring city employees to live in Chicago is not questioned; nor is it seriously doubted that the drafters of the ordinance intended for city employees to establish permanent homes in Chicago rather than sham residences.[3] The due process infirmity of the ordinance, however, lies chiefly in its application; the lack of standards which allows for arbitrary and discriminatory enforcement. "[A] provision not objectionable on its face may be adjudged unconstitutional because of its effect and operation." (16 Am. Jur. 2d *Constitutional Law* sec. 802, at 948 (1979).) "Not only the final purpose of the laws must be considered *** but the means of its administration ***."[4] (16 Am. Jur. 2d *Constitutional Law* sec. 228, at 665 (1979).) Although an agency's interpretation of its rules must be accorded substantial discretion (*Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill. App. 3d 971, 320 N.E.2d 371) the legislative body cannot give an agency "power in its absolute and unguided discretion to apply or withhold application of the law or to say to whom a law shall or shall not be applicable." (*People v. Tibbitts* (1973), 56 Ill. 2d 56, 59, 305 N.E.2d 152, 155.) Therefore, due process is violated if a law is so vague and standardless as to leave the public uncertain to what is and is not prohibited (*In re Serna* (1978), 67 Ill. App. 3d 406, 385 N.E.2d 87) or if it does not supply sufficient guidelines to the administrative body charged with its enforcement. *People ex rel. Stamos v. Public Building Com.* (1968), 40 Ill. 2d 164, 238 N.E.2d 390, 397.

With respect to the vagueness of the ordinance, we find persuasive Justice Simon's reasoning in his dissenting opinion in *Miller v. Police Board* (1976), 38 Ill. App. 3d 894, 349 N.E.2d 544. In *Miller* the majority of the court upheld the Police Board's decision to dis-

---

[3]It is curious that the drafters did not substitute "domicillary" for "actual resident," especially since the ordinance, which originally used "resident," was later amended by the addition of the adjective "actual."

[4]Discriminatory administration of laws may also be analyzed as a violation of the equal protection clause of the fourteenth amendment. If a law operates unequally so that any particular person of a class is singled out for the imposition of burdens not imposed upon or borne by all of the class the law may violate both due process and equal protection. (See 16 Am. Jur. 2d *Constitutional Law* secs. 802, 803, 817 (1979).) Generally, however, there must be demonstrated an element of intentional or purposeful discrimination against a particular class of persons for an equal protection violation to be established. 16 Am. Jur. 2d *Constitutional Law* sec. 803 (1979).

charge the plaintiff, a 20-year veteran, for violating the residency ordinance (which at that time did not contain the modifier "actual"). The *Miller* majority's opinion was based on the manifest weight of the evidence issue and the court specifically held that the constitutional issue had been waived because it was raised for the first time in plaintiff's petition for rehearing. Justice Simon's dissent is worth reading in its entirety. First, he stated that "the wording of the police department rule on which Lieutenant Miller's discharge was based [is] too vague and indefinite to deal adequately with a police officer who maintains two homes, one of which is outside Chicago and within easy commuting distance." (38 Ill. App. 3d 894, 901, 349 N.E.2d 544, 550.) He further pointed out that the word "reside" is synonymous with live, dwell, abide, stay, or lodge, and that it could not be seriously disputed that the plaintiff officer was "dwelling, staying or lodging" at his Chicago apartment. Furthermore, the residency requirement of the police department "was adopted for purposes entirely different than the residence determinations in the cases relied on by the majority," which dealt with inheritance rights, divorce, and the right to public aid. "None of those cases hold that a person may not regularly and frequently absent himself from his domicile or residence in the State of Illinois or in any city in the State." 38 Ill. App. 3d 894, 901, 349 N.E.2d 544, 550.

Justice Simon further discussed the variety of meanings that the word "residence" may have and noted that the purpose of requiring police officers to live in Chicago did not prevent a police officer from maintaining a second home outside the city. Justice Simon further commented that even the presence of an officer's wife with him in Chicago does not guarantee that they would not spend much of their time in a second home outside the city and that as he read the majority opinion, "there is no way an officer could reside in Chicago within the meaning of the rule unless his wife and children also lived in Chicago, except if he was separated from his wife." (38 Ill. App. 3d 894, 902.) Finally, Justice Simon concluded that "[a] public employee is entitled to have the rules of conduct applicable to him defined so that they are clear on their face without the need to refer to case law. For that reason, I believe that unless redrafted to notify police officers in a precise manner which clearly explains what elements the Police Board will look to in determining where a police officer resides and under what circumstances an officer may use a second home outside the city, the rule is incapable of fair enforcement." 38 Ill. App. 3d 894, 901, 349 N.E.2d 544, 551.

We adopt Justice Simon's reasoning on this issue. We do not be-

lieve that the modifier "actual" cures the term "resident" of the problems outlined above.[5] Even if the ordinance were redrafted to substitute domicile for residence, the practical problem of whether a city employee could own a suburban home for his family would remain unclear. Moreover, the domicile of a person's family is only one of the relevant factors, since it is possible for one to be domiciled apart from one's spouse or children. *Choike v. City of Detroit* (1980), 94 Mich. App. 703, 707-08, 290 N.W.2d 58, 60.

In addition to, or perhaps because of, the vagueness problem, the administration of the residency rule becomes crucial. Defendants deny the need for specificity in setting out the standards for enforcement; they urge us to leave the administration of the ordinance to "the integrity and common sense" of the Personnel Board members whose interpretation may be judicially reviewed for correctness on a case-by-case basis. Plaintiff Byttow's motion to supplement authority includes a number of Personnel Board decisions involving other firemen who were charged with violating the residency ordinance. They persuasively demonstrate how inconsistently this ordinance has been enforced. Of seven men who were found guilty of violating the ordinance, none were discharged from the fire department. The Personnel Board dismissed the charges against one man, despite its certification of the hearing officer's finding that the Department had presented evidence which supported the charges. Another man, who admitted

---

[5]Ironically, Black's Law Dictionary includes the following definition of domicile:

"The permanent residence of a person or the place to which he intends to return even though he may *actually reside* elsewhere." (Emphasis added.) (Black's Law Dictionary 435 (5th ed. 1979).)

In an opinion letter to an official of the Office of Housing and Buildings, Department of Local Government Affairs, the Attorney General interpreted a residency provision which provided that a Commissioner of the Chicago Housing Authority "shall be a resident of the area of operation of the Authority ***." (Ill. Rev. Stat. 1971, ch. 67½, par. 3.) The Attorney General noted the confusion that has resulted from failing to distinguish the terms "domicile" and "residence" and concluded that plural residences were permitted under the statute as long as the Commission "intends in good faith that his residence within the Authority's area of operation is to be his official residence." After listing some factors to help determine a person's intent with regard to a residence, the Attorney General concluded that "a Chicago Housing Authority Commissioner may maintain any number of residences or abodes both within and without Illinois, and he may choose one of these residences as his official residence. An additional residence outside the area of operation of the Authority is only one of the many factors to be considered in verifying a person's residence under the Act and of itself does not negate his expressed intent. This is true especially in view of the fact that no definition, guidelines or limitations are set out in the Act." Attorney General's Opinion Letter to Robert J. Lehnhausen, file No. NP—312, June 30, 1971.

spending at least three nights a week in Oak Lawn with his wife and children, received a 30-day suspension. Three more men received 60-day suspensions. The hearing officer in one of the latter three cases had recommended discharge. In the second case, retention was recommended and in the third case, the hearing officer cited some mitigating factors (long service, good work record, attempts to move to Chicago) and recommended a "substantial period of suspension." In each of the above cases the Personnel Board simply imposed the suspensions without explanation. In the seventh case, the fireman was a six-year employee whose wife and family resided in Midlothian. The fireman's rent-free dwelling in Chicago was in the basement of a friend's house and he had no furniture or clothing in Chicago. He admitted spending most of his off-duty time in Midlothian. The Personnel Board adopted the hearing officer's recommendation to discharge the fireman. Following a rehearing, however, the Board reinstated him despite the hearing officer's finding that "nothing presented at rehearing refutes the evidence previously presented sustaining respondent's violation of the residency rule. The evidence presented at best mitigates the offense and demonstrates a good faith effort in respondent's part to comply, admittedly belatedly, with the Fire Commissioner's residency ultimatum of August of 1979. *** Accordingly, I recommend that the previous order discharging respondent be reversed ***."

An eighth case, included in plaintiff Green's brief, is a Personnel Board decision that a firefighter did not violate the ordinance. In that case, as in the present ones, department investigators observed the firefighter in the early morning hours at the suburban home of the wife (who was not legally separated from him.) A canvass of the three neighbors at the Chicago address of the firefighter yield no positive identification of the respondent. The firefighter in that case had one car registered in the suburb. His Chicago apartment was a 10' x 20' room with no kitchen facility. The only clothing that an investigator found at the apartment was one blazer. The Personnel Board dismissed the charges, finding no violation of the ordinance.

■ After reading the other Personnel Board decisions contained in the record we are at a loss to find any reasoned basis of distinction between the plaintiffs' situation and the cases involving the firefighters who were not discharged. The ordinances on its face provides that those who violate it *shall* be discharged, yet in the above cases, the most severe sanction was a 60-day suspension. The plaintiffs did not violate the ordinance "more" than did the suspended firefighters; indeed, Bastian and Byttow in particular appear to have presented

sufficient evidence to refute the charges, if there had been a proper standard by which to measure the evidence. We believe that the Personnel Board, in determining future residency cases, must be guided by something other than a mystic discernment of the city employee's "intent."[6] "The uncertainty in a statute which will amount to a denial of due process of law is not the difficulty of ascertaining whether close cases fall within or without the prohibition of the statute, but whether the standard established by the statute is so uncertain that it cannot be determined with reasonable definiteness that any particular act is disapproved ***." (16 Am. Jur. 2d *Constitutional Law* sec. 818, at 992 (1979).) We hold that chapter 25, section 30 of the Chicago Municipal Code is unconstitutionally vague because it lacks enforceable standards. Additionally, we find that it was applied in such a way as to violate plaintiffs' right to due process of law.

Because of our disposition of this case we need not address the other issues raised by plaintiffs, with the exception of Bastian's cross-appeal for attorney fees under section 1988 of the United States Code. (42 U.S.C. sec. 1988 (1976).) He reasons that he proved the elements of a civil rights action pursuant to 42 U.S.C. sec. 1983 (1976), which requires a showing that defendants acted under color of statute and violated plaintiffs' civil rights. Bastian argues that defendants' treatment of him was motivated at least in part by "1. a political element, the firing of plaintiff because of his earnings, the plaintiff having reached the top of the salary schedule, and 2. retribution for participation in a strike." Further, he cites newspaper articles included in the record which carry stories regarding the dual residency of certain mayorally appointed, high ranking officials who allegedly are virtually "exempt" from compliance with the residence requirements.

In response to Bastian's contentions, we initially note that he is not automatically entitled to attorney fees as the prevailing party under section 1988. Award of such fees is clearly within the trial court's discretion, as the statute expressly provides. Furthermore, the allegations that plaintiff's discharge was in retribution for a strike is not borne out in the record; nor is there verification that he and others were discharged "to rid the city of highly paid career service employees." We will not speculate as to the veracity of these charges and

---

[6]Of course, the administrative agency's ultimate factual finding of a person's domicile or permanent residence will be based on that person's intent. The agency's decision, however, must be supported by competent evidence, and the city has the burden of proving that an employee has not complied with the residency requirements. See *Choike v. City of Detroit* (1980), 94 Mich. App. 703, 708, 290 N.W.2d 58, 60-61.

conclude that the trial court's refusal to grant plaintiff attorney fees was not an abuse of discretion.

For the reasons enumerated above, we hold that the municipal ordinance is unconstitutional because it lacks definite standards for equitable enforcement. Alternatively, the ordinance was unconstitutionally applied to plaintiffs. We affirm the trial court's judgment reversing the Personnel Board's discharge of Bastian, Byttow, and Green and remand the cause for further proceedings.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.